IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Donna Cann, | : | |
| | : | Case No. 1:12-cv-489 |
| Plaintiff, | : | |
| | : | Chief Judge Susan J. Dlott |
| v. | : | |
| | : | Order Granting Defendant's |
| Pierce Township, | : | Motion for Summary Judgment |
| | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion for Summary Judgment (Doc. 10). Plaintiff Donna Cann alleges in this lawsuit that she was terminated from her employment with Defendant Pierce Township for unlawful reasons. For the reasons that follow, the Court concludes that Cann lacks sufficient evidence to prove that her termination was unlawful. The Court will **GRANT** the Motion for Summary Judgment.

I.  STATEMENT OF UNDISPUTED FACTS

The following statement of facts is derived, except where otherwise noted, from Defendant's [Proposed] Statement of Undisputed Facts (Doc. 29-1) and Plaintiff's Response (Doc. 33) thereto.

A.  Factual Background

Cann began her employment with Pierce Township on July 3, 2000 as the Assistant Zoning Inspector. Cann was hired as the full-time Zoning Inspector in June 2002. Ultimately, Cann became the Pierce Township Zoning Manager. She reported to the Township Administrator, David Elmer. Cann was an at-will employee.[1]

---

[1] Plaintiff Cann neither admits nor denies this factual assertion in her Response, but instead argues that it is irrelevant. (Doc. 33 at 901.) However, proposed facts not denied, and denials not supported with citations to the evidentiary record, are deemed admitted.

On August 9, 2006, Elmer spoke with Cann about an incident in which she signed an affidavit for a lawsuit captioned *State of Ohio ex rel. Stuart Hartman v. Village of Amelia*, No. 2005-CA-12-111 (Ohio App. 12 Dist.). (Doc. 13-4 at 410.[2]) She signed the affidavit in her capacity as the Zoning Manager without first conferring with Elmer, the Board of Trustees, or the Township Law Director. Elmer testified that he did not believe that Cann signed the affidavit with the intent of harming Pierce Township, but he nonetheless advised Cann that any such future actions could result in disciplinary action against her. (Elmer Dep., Doc. 12 at 188.)

On February 16, 2007, Elmer spoke with Cann about her communications with the public and her handling of sensitive information. Elmer believed Cann had communicated inaccurate or inappropriate information to citizens in three separate instances: (1) Cann had provided the home phone numbers of the Board of Zoning Appeals' members to a citizen who disseminated the numbers to area neighbors; (2) Cann had suggested to a citizen that the only way she would get action by the Township would be to file a lawsuit; and (3) Cann had shared some allegations regarding a development project with individuals outside of the development team. Elmer agreed that the memorandum memorializing their discussion was not considered a disciplinary written warning. (Elmer Dep., Doc. 188–89.) He stated that the discussion was intended to help Cann "accomplish a job constructively and positively." (*Id.*) Also, Cann testified at her deposition that she did not recall sharing the trustees' phone numbers nor encouraging the citizen to sue. (Cann Dep., Doc. 13 at 293–94.)

On June 5, 2007, Elmer counseled Cann relating to two additional incidents. First, Elmer believed that Cann had spoken unfavorably about a proposed development project to a local contractor. Elmer explained that such a conversation could have exposed the Township to legal

---

[2] The page numbers listed in citations to documents filed electronically in the CM/ECF system refer to the "PAGEID #" generated by the system.

2

problems with the developer. The second involved a situation in which Cann provided a citizen with the Law Director's office contact information so that the citizen could discuss his concerns directly with the Law Director. Elmer testified that this was problematic because it was the Law Director's job to give legal advice to Pierce Township, not to citizens. (Elmer Dep., Doc. 12 at 193.) Elmer also counseled Cann for not advising him about the resident's concern. Regarding this June 5, 2007 conversation, Cann denied to Elmer that she had spoken unfavorably about the proposed development project to a contractor. (Cann Dep., Doc. 13 at 297.)

In September 2010, the first of a series of incidents occurred between Cann and James Smith, then the Pierce Township Police Chief. Smith asked Cann about rumors he heard that Cann might run for a Township Trustee position. During that conversation, Cann and Smith discussed potential cost saving measures including a hypothetical scenario under which the Township Police Department would be shut down. (Cann Dep., Doc. 13 at 301–03.) Cann was worried that someone was spreading rumors that she would disband the police department. (*Id.*) Cann described Chief Smith's manner towards her during the conversation as "harassing" and "[b]adgering." (*Id.* at 301.)

Later in September 2010, Cann and Chief Smith spoke again. Smith requested the opportunity to "iron things out" between them. Cann told Smith that they "would be professionally polite to one another, but there would be no joking, no carrying on, no teasing, no nothing." (*Id.* at 305–06, 323–24.) Cann also testified that she was uncomfortable during the conversation because it took place in a locked office to which Chief Smith had the only key to unlock the door. (*Id.* at 306.)

At a Township Board of Trustees meeting in October 2010, Cann and Chief Smith sat next to each other. Chief Smith asked Cann if he could rest his head on her shoulder when he

3

learned that the meeting might be long. Cann felt shocked by Chief Smith's comment and scooted her chair away from his chair. (*Id.* at 298.) Cann testified at her deposition that Chief Smith had not said anything "really of a sexual nature" at the meeting, but she thought his conduct was harassing and inappropriate. (*Id.* at 299, 304–05.) She said that she and Chief Smith did not have a joking relationship and that they had agreed after the September 2010 incidents to speak to each other only in a professionally polite manner. (*Id.* at 305–06.)

The next day, Cann complained to Bonnie Batchler, her friend and a Township Trustee, about what Chief Smith had said to her. Batchler responded that she thought that Chief Smith might have been joking. At some date thereafter, Cann complained to Elmer that Chief Smith had sexually harassed her. (*Id.* at 309–11; Elmer Dep., Doc. 12 at 203.)

On December 15, 2010, Cann requested a meeting between herself, Chief Smith, Batchler, and Fran Kelly, the Pierce Township Law Director. Cann requested this meeting to complain about how Chief Smith had treated her. The issues between Cann and Smith at the time of the December 15, 2010 meeting were their two meetings in September 2010 and the comment made at the October 2010 Trustee meeting. Cann stated that she felt intimidated and threatened by Chief Smith. (Cann Dep., Doc. 13 at 317.) At the meeting, Chief Smith apologized for his comment about putting his head on her shoulder. (*Id.* at 334.) Chief Smith also accused Cann of having improperly altered meeting minutes back in 2005 or 2006. Cann denied altering the meeting minutes back in 2005 or 2006.

Cann testified that Chief Smith also slammed his fist on the table during the meeting and stated that he would work to ensure that Cann was not elected to a trustee position. (*Id.* at 317–18; Batchler Dep., Doc. 16 at 597.) Law Director Kelly testified that Chief Smith slammed his fist on the table when expressing his concern that the police department might be disbanded.

4

(Kelly Dep., Doc. 24 at 746.) She called it only a "run-of-the-mill temper flare-up." (*Id.*) Kelly did not interpret Chief Smith's statements that he would oppose Cann's candidacy for the trustee position to be threatening. (*Id.* at 746–47.) On the other hand, Batchler testified that Chief Smith's behavior at the meeting was inappropriate. (Batchler Dep., Doc. 16 at 597.)

Elmer met with Cann on December 16, 2010 about the prior day's meeting. Cann understood after the meeting that Elmer expected her and Chief Smith to act professionally with one another. Cann and Chief Smith agreed that they would limit their conversations to professional matters. (Cann Dep., Doc. 13 at 340.)

In early January or February 2011, Cann advised Elmer that she would need shoulder surgery and requested to use sick leave. Cann told Elmer she would be off for two weeks in April 2011 and that she would have limited use of her left arm when she returned. Cann provided no medical paperwork to the Township regarding her surgery, nor did the Township request FMLA paperwork. Pierce Township approved Cann's request for a leave of absence. Also, Elmer ordered and had installed an under-the-counter computer keyboard tray for Cann's desk to accommodate any physical limitations that Cann might have upon her return from medical leave. (*Id.* at 361.) Cann's surgery was on April 1, 2011. Cann used accumulated sick time for her medical leave. Of note, Cann had similarly been permitted to use accumulated sick time leave for a medical leave she had taken in January 2010. (*Id.* at 362.)

In the month before she took leave, on March 1, 2011, Cann approached Elmer to report rumors she heard about comments made about her by Smith. Cann heard that during a Clermont County Township Association dinner in February 2011, Smith stated that he would not eat chili prepared by Cann because it might be contaminated. Cann told Elmer that she also heard Smith had made comments to someone about the 2005/2006 "meeting minutes investigation." Cann

5

would not tell Elmer the name of the co-worker who claimed to have heard Smith's comments. Cann told Elmer that she was afraid of Chief Smith and feared that he might physically harm her or her family. (*Id.* at 344.)

On March 30, 2011, the day before her medical leave began, Cann went to Elmer's office to discuss her concern about Smith's attendance at the Zoning Commission meeting the prior evening. Cann did not understand why Smith had attended the meeting, but she acknowledged that he had spoken to the Zoning Commission about issues with an apartment complex that was being discussed at the meeting. Elmer told Cann he would investigate her concerns. After the March 30th meeting with Cann, Elmer asked Chief Smith and Law Director Kelly why Smith had attended the Zoning Commission meeting. Elmer was told that Kelly had asked Smith to attend the meeting because of his knowledge about a specific issue discussed at the meeting. Elmer also learned that Smith had been present at the meeting for less than ten minutes.

Elmer also learned at this time that, before she took medical leave, Cann had requested Richard Schuler, a member of the Zoning Commission, to review a legal memorandum prepared by Law Director Kelly regarding a zoning issue. Schuler was a practicing attorney, but he sat on the Zoning Commission as a citizen, not as an attorney, and he did not provide legal advice to the Commission. (Schuler Dep., Doc. 17 at 666.) Cann did not seek consent from Elmer or the Township to make such a request of Schuler. Schuler understood that Cann had asked him for his opinion as her friend and as an attorney. (*Id.* at 649, 666, 673–74.) He thought that Cann had disagreed with Law Director Kelly on the zoning issue. (*Id.* at 665.) Schuler provided his legal opinion in a letter to Cann dated March 8, 2011. (Doc. 17-1 at 696.) Cann did not share Schuler's written opinion with other Township officials.

Cann testified at her deposition that she had not understood Law Director Kelly's written opinion about the zoning issue and that she had tried unsuccessfully multiple times to reach Kelly to ask her about the issue. (Cann Dep., Doc. 3 at 354.) She testified that she sought Schuler's opinion because he was a member of the Zoning Commission, not because he was an attorney. (*Id.*) She did not pay him nor ask him to share his opinion in writing. (*Id.* at 354–55, 360.)

Nonetheless, Elmer believed that Cann's request for Schuler's opinion was an attempt to undermine the authority of Law Director Kelly. He determined to recommend to the Board of Trustees that Cann be terminated. He explained his recommendation as follows:

> First and foremost, based on the fact that there had been multiple times when Donna and I had talked about her role and responsibilities as a Zoning Manager and its relationship to other employees, particularly legal counsel, and the severity and/or the consequences of engaging in outside legal counsel or compromising our legal counsel's recommendations and practices.
>
> * * * *
>
> The letter that was produced by Dick Schuler at the request of Donna Cann was, in my opinion, an undermine [*sic*] of the authority of the Law Director.
>
> * * * *
>
> The Law Director had written an opinion about a Zoning matter that the subsequent Dick Schuler letter or opinion was premised upon. In that letter, there was no discussion about sharing that letter, there was no discussion about seeking that letter, and it was only discovered by Law Director Kelly upon her meeting with Dick Schuler for the first time, in which Mr. Schuler had asked Ms. Kelly if she had seen the opinion that he wrote in response to her opinion. Ms. Kelly was not aware of it.

(Elmer Dep., Doc. 12 at 167–68.)

Cann returned to work from her medical leave of absence on April 18, 2011. On that date, Elmer advised Cann that she was being placed on administrative leave. The Board of Trustees held a special meeting on April 19, 2011 during which they voted to terminate Cann's

7

employment by a two-to-one vote. Trustees Knoop and Conrad voted for Cann's termination, while Trustee Batchler voted against it. Trustee Conrad testified at his deposition that he believed that Cann's performance was not "up to par" based on his observations and what he heard from citizens. (Conrad Dep., Doc. 14 at 456.) Specifically, he faulted Cann for asking Schuler for a second legal opinion on a zoning matter already addressed by the Law Director and for not sharing that second opinion with the Trustees. (*Id.* at 459–60.) He also stated that Cann had put Pierce Township "between a rock and a hard place" in how she had handled an earlier zoning issue involving a dog kennel. (*Id.* at 458–59.) However, he could not remember the details about that situation or whether Cann was reprimanded in any way. (*Id.* at 458.) Trustee Knoop testified that he faulted Cann for taking actions without informing the Trustees, specifically, seeking legal advice from Schuler and not sharing Schuler's written opinion. (Knoop Dep., Doc. 15 at 537–38.) He also discussed that he had reviewed with Elmer the prior instances of conduct during which Elmer believed Cann acted without authority. (*Id.* at 541–43.)

**B.     Procedural History**

On June 26, 2012, Plaintiff Cann initiated this action by filing a Complaint against Pierce Township. (Doc. 1.) She asserts that she was terminated in retaliation for her complaints that Chief Smith was sexually harassing her and because she took medical leave. Cann asserts three claims for relief: (1) violation of the Family Medical Leave Act ("FMLA"); (2) retaliation in violation of Title VII; and (3) retaliation in violation of Ohio Revised Code Chapter 4112.

Pierce Township has moved for summary judgment. Briefing is complete and the matter is ripe for adjudication.

## II. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the movant has the burden of showing that no genuine issues of material fact are in dispute, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 811 (6th Cir. 2011).

The movant may support a motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). The Court's task is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. A genuine issue for trial exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

### III. ANALYSIS

### A. FMLA Violation

The FMLA makes it unlawful for any employer "to discharge or in any other manner discriminate against any individual for opposing a practice made unlawful" by the FMLA. 29 U.S.C. § 2615(a)(2). In order to establish a prima facie case of FMLA retaliation, the plaintiff must show that: (1) she availed herself of a protected right under FMLA by taking leave or giving her employer notice of intent to take leave; (2) the employer made an adverse employment decision which negatively impacted the plaintiff; and (3) there is a causal connection between the exercise of protected FMLA rights and the adverse employment action, which can be evidenced by a mere showing of close proximity in time between the exercise of the protected right and the adverse employment action. *Skrjanc v. Great Lakes Power Serv., Co.*, 272 F.3d 309, 314 (6th Cir. 2001). The Court need not spend time analyzing whether Cann has sufficient evidence to satisfy the prima facie burden here, because even if she does, she cannot establish that Pierce Township's legitimate non-discriminatory reason for her termination was pretextual.

Pierce Township asserts that the Trustees terminated Zoning Manager Cann because she undermined the Law Director when she solicited a second legal opinion from Richard Schuler about a zoning matter and withheld the opinion from Elmer and the Trustees. Elmer had recommended her termination because he saw the Schuler letter as a continuation of a pattern of behavior where Cann took actions which exceeded her duties as the Zoning Manager. Because Pierce Township has articulated a legitimate reason for her termination, Cann must establish pretext. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973) (explaining the

shifting burdens); *Battle v. Haywood Cnty. Bd. of Educ.*, 488 F. App'x 981, 986 (6th Cir. 2012) (same).

To establish pretext, Cann must present evidence sufficient to prove that the stated reason (1) had no basis in fact, (2) did not actually motivate the decision, or (3) was insufficient to motivate the decision. *Battle*, 488 F. App'x at 986; *Manzer v. Diamond Shamrock Chems., Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). The Sixth Circuit has cautioned that courts should "avoid formalism" in the application of this test, "lest one lose the forest for the trees." *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400, n.4 (6th Cir. 2009). Pretext, the court observed, "is a commonsense inquiry: did the employer fire the employee for the stated reason or not?" *Id.* This pretext inquiry "requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Id.* The pretext test can be distilled to one simple requirement: Cann must produce sufficient evidence such that a reasonable jury could doubt the Defendant's stated reasons for its actions. *See id.*

Cann seeks to establish pretext by demonstrating that Pierce Township's stated reason had no basis in fact or was insufficient to motivate the termination decision. To prove that the stated reason had no basis in fact, Cann must prove that factual allegations underlying the stated reason did not happen or were factually false. *See Manzer*, 29 F.3d at 1084. Turning to Cann's argument that the stated reasons were insufficient to motivate her termination, this type of rebuttal "ordinarily[] consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct." *Id.* Cann appears to blend the two pretext arguments.

Cann asserts that her signing an affidavit in 2006 for the *State of Ohio ex rel. Hartman v. Village of Amelia* case was not sufficient to motivate her termination because Elmer conceded

11

that Cann did not intend to harm Pierce Township.  Regarding the communication issues which prompted Elmer to counsel Cann in February 2007, Cann refutes the facts in part and contends that the issues were insufficient to justify her termination.  She testified that she did not recall sharing Trustees' phone numbers nor encouraging a citizen to sue Pierce Township.  She also points out that Elmer did not issue any formal discipline related to the February 2007 incidents.  Regarding the June 2007 incidents, Cann denied that she had spoken unfavorably about a proposed development project.  She also argues that the incident in which she gave a citizen contact information for the Law Director did not justify her termination because she was not disciplined for the incident.  In response, Pierce Township contends that these earlier incidents merely provide context for Elmer's decision to recommend Cann's termination in 2011 following the Schuler legal opinion incident.  Although Elmer did not issue written discipline for these earlier incidents, Cann does not deny that Elmer had counseled her about these incidents.

Regarding the Schuler incident, Cann disputes some factual aspects of the incident.  She denies that she sought Schuler's advice in his capacity as an attorney, regardless of how he viewed the request.  She points out that she did not pay Schuler nor ask for his opinion in writing.  She also points out that Law Director Kelly testified that she did not believe that the Schuler incident was sufficient grounds for termination.  (Kelly Dep., Doc. 24 at 753–54.)  Finally, she faults Administrator Elmer for not investigating the circumstances surrounding the Schuler opinion letter, specifically for not talking to either Schuler or Cann, before recommending Cann's termination.  (Elmer Dep., Doc. 12 at 171–73.)

Pierce Township responds that Administrator Elmer and the Trustees exercised reasonable business judgment regardless of whether Cann or even Law Director Kelly disagreed with the decision.  The Court is not to second guess the honestly-held business judgment of

employers so long as the judgment is based on reasonable, particularized facts. *McConnell v. Swifty Transp., Inc.*, 198 F. App'x 438, 443 (6th Cir. 2006). Regarding the argument that Elmer should have spoken to Schuler or Cann before recommending her termination, the Court finds that Elmer nonetheless based his recommendation upon particularized facts. He spoke to Law Director Kelly, who had spoken to Schuler, and he reviewed a copy of the opinion letter which Schuler gave to Cann. (Elmer Dep., Doc. 12 at 168–69.) Also, as to Law Director Kelly's personal thoughts about Cann's termination, she testified that Cann's request for a second opinion from Schuler was not "courteous" and made her "uneasy." (Kelly Dep., Doc. 24 at 753.) She found the matter to be serious enough that she had reported it to Elmer. (*Id.* at 754.) Kelly was not directly involved in the process to terminate Cann in any event.

Moreover, the evidence suggests that Pierce Township supported Cann when she requested to take a medical leave of absence. No one discouraged her from taking leave or made disparaging remarks about her leave. In fact, Cann previously had taken medical leave in January 2010 without any negative consequence. Additionally, Administrator Elmer had installed a modified keyboard for Cann to make it easier for her to perform her job duties upon her return from the April 2011 leave. This Court must follow the Sixth Circuit's admonition to not lose the forest for the trees. *See Chen,* 580 F.3d at 400 n.4. The Court may question whether Cann should have been terminated because she requested a second legal opinion from Schuler about a zoning issue. Nonetheless, the Court concludes that no reasonable jury would find on the evidence presented that Pierce Township terminated Cann because she took a medical leave of absence.

Accordingly, the Court will grant summary judgment to Pierce Township on the FMLA claim.

**B.     Title VII and Ohio Revised Code Chapter 4112 Retaliation**

In her second and third causes of action, Cann complains that she was terminated in retaliation for making sexual harassment complaints against Chief Smith. Title VII makes it unlawful for employers "to discriminate against any individual . . . because [she] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). Similarly, the Ohio Revised Code makes it unlawful "[f]or any person to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice." Ohio Rev. Code § 4112.02(I).

To prove a Title VII retaliation claim, Cann must come forward with evidence that (1) she engaged in protected activity; (2) Pierce Township was aware of the protected activity; (3) Pierce Township took an adverse employment action against her; and (4) there was a causal connection between the adverse employment action and the protected activity. *See Nicholson v. City of Clarksville, Tenn.*, --- F. App'x ---, No. 12-6318, 2013 WL 3746098, at *11 (6th Cir. July 17, 2013). Additionally, Title VII retaliation claims "must be proved according to traditional principles of but-for causation . . . [which] requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. SW Med. Center v. Nassar*, 133 S. Ct. 2517, 2533 (2013). Ohio Revised Code § 4112.02(I), likewise, requires but-for causation. *Smith v. Dep't of Pub. Safety*, No. 12AP-1073, --- N.E.2d ---, 2013 WL 5436580, at *12 (Ohio App. Sept. 26, 2013).

For purposes of this analysis, the Court will assume that Cann can satisfy the first three prongs of the prima facie standard. The fourth prong of the prima facie standard, causation, and the issue of pretext overlap in the circumstances of this case. Pierce Township denies that Cann was terminated for reporting Chief Smith for sexual harassment. It states that she was terminated

14

because she improperly solicited a second legal opinion on a zoning matter from Richard Schuler and then withheld his written opinion from others in the Township. In seeking to rebut this proffered non-retaliatory reason, Cann relies in part on the pretext arguments discussed in the previous section on the FMLA retaliation claim. Those pretext arguments and Pierce Township's responses do not need to be restated here.

In addition, however, Cann offers other evidence purportedly relevant to causation. Initially, Cann points to the fact that only approximately four months passed between December 2010, when she requested a meeting with Trustee Batchler, Law Director Kelly, and Chief Smith to complain about Chief Smith's conduct towards her, and April 2011, when she was terminated. The Sixth Circuit has held, however, that a four-month gap between the protected conduct and a termination was insufficient standing alone to support an inference of retaliation. *Cooper v. City of North Olmstead*, 795 F.2d 1265, 1272 (6th Cir. 1986).

Cann also argues that she was treated less favorably than Administrator Elmer and Chief Smith when they committed misconduct and that this disparate treatment is evidence that her termination was done with retaliatory intent. Chief Smith, who was married, admitted that he engaged in an inappropriate personal relationship with Law Director Kelly. (Smith Dep., Doc. 26 at 803; Elmer Dep., Doc. 12 at 139.) Cann suggests that Elmer did not recommend firing Chief Smith, but he had recommended firing her. Also, Elmer requested in the statement announcing Chief Smith's termination that he be treated with "dignity, respect and courtesy," but issued only a cursory statement announcing her termination. (Doc. 27-1 at 844–45.) Cann contends that Elmer was biased in favor of Chief Smith. Elmer testified that Chief Smith was a man he "admire[d] and respect[ed]" and stated he was a "truthful, honest individual who

demonstrated a genuine care for the residents." (Elmer Dep., Doc. 12 at 137.) Cann's argument regarding Chief Smith, however, is misleading factually.

At his deposition, Elmer described Chief Smith's conduct with Kelly as "conduct unbecoming an officer" and stated that he had lost confidence in Chief Smith's "ability to lead a department." (Elmer Dep., Doc. 12 at 139.) Elmer testified that he "didn't think that [Chief Smith] deserved to be terminated," but he also stated that he did not think that Chief Smith "was able to retain his position as Police Chief." (*Id.* at 138.) Elmer ordered Chief Smith to take a leave of absence using sick time starting on May 30, 2011 and Chief Smith was terminated effective August 25, 2011. (Smith Dep., Doc. 26 at 799, 808.)

Relatedly, Cann asserts that Pierce Township turned a blind eye toward unprofessional misconduct by Administrator Elmer himself. Cann asserts that Elmer should have been disciplined after he threatened violence against a resident at a Trustees meeting. Elmer thought the township resident was being discourteous to Trustee Knoop and he "challenged" the resident to "step outside." (Elmer Dep., Doc. 12 at 162–63.) Elmer agreed that he said something to the effect of "I'll take off my necktie and we can step outside." (*Id.*) Trustee Knoop understood Elmer to be challenging the resident to a physical confrontation. (Knoop Dep., Doc. 15 at 560.) Elmer received a written reprimand, but was not terminated. (Elmer Dep., Doc. 12 at 164.)

The Court concludes that Chief Smith and Elmer are not similarly situated to Cann such that the purported disparate treatment of Cann is indicative of retaliatory conduct on behalf of Pierce Township. In the disciplinary context, other individuals usually are considered to be "similarly situated" to the plaintiff only if the individuals "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the

16

employer's treatment of them for it." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (citation omitted). However, courts should make independent determinations in each case to determine the "relevant aspects" of comparison between the plaintiff and the purported similarly-situated employees. *Id.* The plaintiff must show only that the employees were engaged in misconduct of "comparable seriousness." *Harrison v. Metro. Gov't of Nashville and Davidson Cty., Tenn.*, 80 F.3d 1107, 1115 (6th Cir. 1996) (citation omitted), *overruled on other grounds by Jackson v. Quanex Corp.*, 191 F.3d 647, 667 (6th Cir. 1999).

To begin, the Court disagrees with Cann's premise that Cann suffered disparate treatment in comparison to Chief Smith in relevant respect. Regardless of any personal bias that Elmer might have had in favor of Chief Smith, Pierce Township terminated the employment of both Chief Smith and Cann for alleged misconduct. Regarding Elmer, Elmer and Cann are not similarly situated in all relevant respects. Cann and Elmer did not have similar positions within the Pierce Township employment hierarchy and did not have the same immediate supervisor because Elmer was Cann's supervisor. Also, there is no evidence that the Elmer "step outside" situation was anything but an isolated incident. Conversely, Elmer had counseled Cann previously for conduct which he believed was outside the scope of her duties as the Zoning Manager.

In sum, upon consideration of the totality of the evidence, Cann has not presented sufficient evidence that Pierce Township's stated reason for Cann's termination was prextual or that an intent to retaliate against Cann for accusing Chief Smith of sexual harassment was the "but-for" reason that Pierce Township terminated Cann's employment. The Court will grant summary judgment to Pierce Township on the Title VII and Ohio Revised Code retaliation claims.

## IV. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 10).

**IT IS SO ORDERED.**

S/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court